UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-20160-CR-WILLIAMS

UNITED STATES OF AMERICA

vs.

LEONEL RIVERO,

    Defendant.
_____/

## PLEA AGREEMENT

The United States Attorney's Office for the Southern District of Florida, the Fraud Section of the Criminal Division of the United States Department of Justice (collectively, "the Government") and Leonel Rivero (hereinafter referred to as the "defendant") enter into the following agreement:

1. The defendant agrees to plead guilty to the information, which charges the defendant with wire fraud, in violation of 18 U.S.C. § 1343.

2. The defendant understands that he has the right to have the evidence and charges against him presented to a Federal grand jury for a determination of whether or not there is probable cause to believe that he committed the offense with which he is charged. Understanding that right, and after full and complete consultation with his counsel, the defendant agrees to waive in open court his right to prosecution by indictment and agrees that the Government may proceed by way of an information filed pursuant to Rule 7 of the Federal Rules of Criminal Procedure.

3. The defendant is aware that the sentence will be imposed by the Court after considering the advisory Federal Sentencing Guidelines and Policy Statements (hereinafter, "Sentencing Guidelines"). The defendant acknowledges and understands that the Court will compute an

advisory sentence under the Sentencing Guidelines and that the applicable guidelines will be determined by the Court relying in part on the results of a pre-sentence investigation by the Court's probation office, which investigation will commence after the guilty plea has been entered. The defendant is also aware that, under certain circumstances, the Court may depart from the advisory Sentencing Guidelines range that it has computed, and may raise or lower that advisory sentence under the Sentencing Guidelines. The defendant is further aware and understands that the Court is required to consider the advisory guideline range determined under the Sentencing Guidelines, but is not bound to impose a sentence within that advisory range; the Court is permitted to tailor the ultimate sentence in light of other statutory concerns, and such sentence may be either more severe or less severe than the Sentencing Guidelines' advisory range. Knowing these facts, the defendant understands and acknowledges that the Court has the authority to impose any sentence within and up to the statutory maximum authorized by law for the offense identified in paragraph 1 and that the defendant may not withdraw the plea solely as a result of the sentence imposed.

4. The defendant also understands and acknowledges that the Court may impose a statutory maximum term of imprisonment of up to twenty years, followed by a term of supervised release of up to three years. In addition to a term of imprisonment and supervised release, the Court may impose as to each count of conviction a maximum fine the greater of (a) $250,000 or (b) twice the gross pecuniary loss incurred by the victims in this case. The defendant acknowledges that restitution must also be imposed.

5. The defendant further understands and acknowledges that, in addition to any sentence imposed under paragraph 4 of this agreement, a special assessment in the amount of $100 will be imposed on the defendant. The defendant agrees that any special assessment imposed shall be paid at the time of sentencing. If the defendant is financially unable to pay the special assessment,

2

the defendant agrees to present evidence to the Government and the Court at the time of sentencing as to the reasons for the defendant's failure to pay.

6. The Government reserves the right to inform the Court and the probation office of all facts pertinent to the sentencing process, including all relevant information concerning the offenses committed, whether charged or not, as well as concerning the defendant and the defendant's background. Subject only to the express terms of any agreed-upon sentencing recommendations contained in this agreement, the Government further reserves the right to make any recommendation as to the quality and quantity of punishment.

7. The Government agrees that it will recommend at sentencing that the Court reduce by two levels the Sentencing Guidelines level applicable to the defendant's offense, pursuant to Section 3E1.1(a) of the Sentencing Guidelines, based upon the defendant's recognition and affirmative and timely acceptance of personal responsibility. If at the time of sentencing the defendant's offense level is determined to be 16 or greater, the Government will file a motion requesting an additional one level decrease pursuant to Section 3E1.1(b) of the Sentencing Guidelines, stating that the defendant has assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the defendant's intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Government and the Court to allocate their resources efficiently. The Government further agrees to recommend that the defendant be sentenced within the advisory guideline range as that range is determined by the Court. The Government, however, will not be required to make this motion and these recommendations if the defendant: (1) fails or refuses to make a full, accurate and complete disclosure to the probation office of the circumstances surrounding the relevant offense conduct; or (2) commits any misconduct after entering into this plea agreement, including

but not limited to committing a state or federal offense, violating any term of release, or making false statements or misrepresentations to any governmental entity or official.

8. Acknowledging that the parties' recommendations as to sentencing are not binding on the probation office or the Court, the Government and the defendant agree that, at sentencing:

(a)    the Government and the defendant shall jointly recommend that the relevant amount of actual, probable, or intended loss under Section 2B1.1(b)(1) of the Sentencing Guidelines resulting from the offense committed by the defendant in this case is between $1.5 million and $3.5 million.

9. The defendant is aware that the sentence has not yet been determined by the Court. The defendant also is aware that any estimate of the probable sentencing range or sentence that the defendant may receive, whether that estimate comes from the defendant's attorney, the Government, or the probation office, is a prediction, not a promise, and is not binding on the Government, the probation office or the Court. The defendant understands further that any recommendation that the Government makes to the Court as to sentencing, whether pursuant to this agreement or otherwise, is not binding on the Court and the Court may disregard the recommendation in its entirety. The defendant understands and acknowledges, as previously acknowledged in paragraph 3 above, that the defendant may not withdraw the defendant's plea based upon the Court's decision not to accept a sentencing recommendation made by the defendant, the Government, or a recommendation made jointly by the defendant and the Government.

10. The Government and the defendant stipulate to and agree not to contest the following facts, and stipulate that such facts, in accordance with Rule 11(b)(3) of the Federal Rules of Criminal Procedure, provide a sufficient factual basis for the defendant's plea of guilty in this case:

4

## FACTUAL BASIS

<u>The Paycheck Protection Program and the Economic Injury Disaster Loan Program</u>

a. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in March 2020, to provide financial assistance to Americans suffering economic harm from the COVID-19 pandemic. One source of relief provided through the CARES Act was the authorization of forgivable loans to businesses for job retention and certain other expenses, through a program called the Paycheck Protection Program ("PPP").

b. Among the types of businesses eligible for a PPP loan were individuals who operated under a "sole proprietorship" business structure. Such individuals were eligible to receive a maximum PPP loan of up to $20,833 to cover lost compensation or income from the sole proprietorship. In order to be eligible to receive such a PPP loan, individuals had to report and document their income and expenses from the sole proprietorship, as typically reported to the Internal Revenue Service ("IRS") on Form 1040, Schedule C, for a given tax year. The lending institution or loan processor used this information and documents to calculate the amount of money the individual was entitled to receive under the PPP.

c. The CARES Act required PPP loan applications to be processed by a participating lender. If a PPP loan application was approved, the participating lender would fund the PPP loan using its own monies, which are guaranteed by the Small Business Administration ("SBA"). Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, were transmitted by the lender to the SBA in the course of processing the loan.

d. The CARES Act further required that PPP loan proceeds be used by the business for certain permissible expenses—namely, payroll costs, interest on mortgages, rent, and utilities.

5

Additionally, the CARES Act authorized the forgiveness of PPP loans and any interest if the business: (a) spent the loan proceeds on these items within a designated period of time after receiving the proceeds and (b) spent a certain amount of the PPP loan proceeds on payroll expenses.

### The Defendant and Related Entities

e. The defendant was a resident of Miami, Florida, and worked primarily as a tax preparer.

f. Rivero Tax Group Inc. ("RTG") was a Florida corporation that was registered on or about May 2, 2016. The defendant was the registered agent and principal of the company.

g. SBA Loan Processor 1 was a financial-technology company based in California. SBA Loan Processor 1 participated in the SBA's PPP by, among other things, acting as a service provider for small businesses and certain lenders. Small businesses seeking a PPP loan could apply through SBA Loan Processor 1, which would review the PPP loan applications. If a PPP loan application received was approved for funding, a partner financial institution disbursed the loan funds to the applicant.

h. Wells Fargo Bank, N.A. ("Wells Fargo") was a federally insured financial institution based in South Dakota.

### The Fraudulent PPP Loan Applications

i. Between in or around May 2020 and in or around June 2020, the defendant submitted approximately 118 fraudulent PPP loan applications to SBA Loan Processor 1 on behalf of himself and others.

j. All of the 118 loan applications were electronically submitted via the Internet from the same Internet Protocol ("IP") address—a numerical label assigned to each device connected to a computer network that uses the Internet. The IP address was registered to the defendant's residence in South Florida.

k. All of the 118 loan applicants applied as sole proprietorships. Ninety-nine of the 118 loan applicants requested $20,583.34, which was just under the highest allowable PPP loan for a sole proprietorship ($20,833). Combined, the 118 PPP loan applications sought approximately $2,334,064 in PPP loan funds

l. On each PPP loan application, the defendant falsely stated the named applicant's prior-year income and expenses. In support of these false representations, the defendant repeatedly submitted false and fraudulent IRS forms, which purported to document income and expenses from the named applicant's sole proprietorship.

m. Specifically, nearly all of the 118 loan applications contained identical 2019 IRS Form 1040, Schedule C information. The 2019 IRS Form 1040, Schedule Cs declared the same costs and expenses, to the dollar, including:

      i. $11,745 for material and supplies;
      ii. $850 for uniforms;
      iii. $1,754 for cellular telephone usage; and
      iv. $6,544 for equipment.

n. In addition, nearly all of the 118 loan applications claimed the same number of miles for business-related traveled in 2019 (10,474 miles).

o. Approximately 47 of the 118 fraudulent PPP loan applications were funded, resulting in the disbursement of approximately $975,582 to the named applicants' accounts at approximately seven different financial institutions.

The Defendant's Fraudulent PPP Loan Application to SBA Loan Processor 1

p. On or about May 15, 2020, the defendant submitted a PPP loan application to SBA Loan Processor 1 on behalf of himself as a sole proprietorship. The application sought approximately $15,375.01 in PPP loan funds.

q. The application on behalf of the defendant included a 2019 IRS Form 1040, Schedule C, which reflected the following:

    i. The defendant listed his principal business or profession as "tax preparer";
    ii. The defendant claimed $139,475 in gross receipts or sales and a net profit of $103,653 in 2019, which was identical to nearly all of the other PPP loan applications submitted to SBA Loan Processor 1 from the defendant's IP address;
    iii. The defendant listed the same expenses as almost all of the other PPP loan applications submitted to SBA Loan Processor 1 from the defendant's IP address, including:
        1. $11,745 for material and supplies;
        2. $850 for uniforms;
        3. $1,754 for cellular telephone usage; and
        4. $6,544 for equipment; and
    iv. The defendant listed the same mileage for business-related travel (10,474 miles) as almost all of the other PPP loan applications submitted to SBA Loan Processor 1 from the defendant's IP address.

r. On or about May 19, 2020, the PPP loan application on behalf of the defendant was approved by SBA Loan Processor 1, and a partner financial institution deposited approximately $15,375.01 into a bank account in the name of RTG at Wells Fargo.

**FORFEITURE**

11. The defendant agrees, in an individual and any other capacity, to forfeit to the United States, voluntarily and immediately, any right, title, and interest to any property, real or personal, which constitutes or is derived from proceeds traceable to such violation, pursuant to 18 U.S.C. § 981(a)(1)(C), as incorporated by 28 U.S.C. § 2461(c), and the provisions of 21 U.S.C. § 853. In

8

addition, the defendant agrees to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p). The property subject to forfeiture includes, but is not limited to:

    a. a forfeiture money judgment in the sum of $975,582.00 in U.S. currency, which sum represents the value of the property subject to forfeiture;

    b. substitute property, including, but not limited to:

        i. approximately $197,611.01 formerly on deposit in 6079717002 at Wells Fargo Bank, N.A. held in the name of Rivero Tax Group, Inc.; and

        ii. approximately $773,600.00 in U.S. currency seized from the defendant's residence on or about September 28, 2020.[1]

12. The defendant further agrees that forfeiture is independent of any assessment, fine, cost, restitution, or penalty that may be imposed by the Court. The defendant knowingly and voluntarily agrees to waive all constitutional, legal, and equitable defenses to the forfeiture, including excessive fines under the Eighth Amendment to the United States Constitution. In addition, the defendant agrees to waive: any applicable time limits for administrative or judicial forfeiture proceedings, the requirements of Fed. Rs. Crim. P. 32.2 and 43(a), and any appeal of the forfeiture.

13. The defendant also agrees to fully and truthfully disclose the existence, nature and location of all assets in which the defendant has or had any direct or indirect financial interest or

---

[1] A third-party claim was filed in the administrative forfeiture proceedings for this asset. The defendant only consents to the forfeiture of his interest in the assets listed in paragraph 11b.

9

control, and any assets involved in the offense of conviction. The defendant agrees to take all steps requested by the United States for the recovery and forfeiture of all assets identified by the United States as subject to forfeiture. This includes, but is not limited to, the timely delivery upon request of all necessary and appropriate documentation to deliver good and marketable title, consenting to all orders of forfeiture, and not contesting or impeding in any way with any criminal, civil or administrative forfeiture proceeding concerning the forfeiture.

14. The Government agrees to seek approval from the Department of Justice's Money Laundering and Asset Recovery Section ("MLARS") to have any assets forfeited in this case applied to the defendant's restitution judgment so long as the following conditions are met: 1) the defendant agrees, in accordance with paragraph 15 below, to submit a financial disclosure within fourteen days of the change of plea hearing; and 2) the Government determines that the defendant does not have sufficient assets to satisfy both the forfeiture money judgment and the restitution judgment in accordance with Department of Justice Policy regarding restoration requests. The defendant understands that MLARS has the sole discretion to restore forfeited assets to the restitution judgment, and there is no guarantee that the forfeited assets will in fact be applied to the restitution judgment in this case.

15. In furtherance of the satisfaction of a forfeiture money judgment entered by the Court in this case, the defendant agrees to the following:

    a. submit a financial statement to the Government upon request, within 14 calendar days from the request;

    b. maintain any asset valued in excess of $10,000, and not sell, hide, waste, encumber, destroy, or otherwise devalue such asset without prior approval of the United States;

      c.      provide information about any transfer of an asset valued in excess of $10,000 since the commencement of the offense conduct in this case to date;

      d.      cooperate fully in the investigation and the identification of assets, including liquidating assets, meeting with representatives of the United States, and providing any documentation requested; and

      e.      notify, within 30 days, the Clerk of the Court for the Southern District of Florida and the Government of: (i) any change of name, residence, or mailing address, and (ii) any material change in economic circumstances.

The defendant further understands that providing false or incomplete information about assets, concealing assets, making materially false statements or representations, or making or using false writings or documents pertaining to assets, taking any action that would impede the forfeiture of assets, or failing to cooperate fully in the investigation and identification of assets may be used as a basis for: (i) separate prosecution, including, under 18 U.S.C. § 1001; or (ii) recommendation of a denial of a reduction for acceptance of responsibility pursuant to Section 3E1.1 of the Sentencing Guidelines.

## **CONCLUSION**

16. This is the entire agreement and understanding between the Government and the defendant. There are no other agreements, promises, representations, or understandings.

                                            For the United States:

                                            JUAN ANTONIO GONZALEZ
                                            ACTING UNITED STATES ATTORNEY

Date: 9/3/21

By: _____
CHRISTOPHER BROWNE
ASSISTANT U.S. ATTORNEY

DANIEL S. KAHN
ACTING CHIEF, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

Date: 9/3/21

By: _____
DELLA SENTILLES    FOR
TRIAL ATTORNEY
FRAUD SECTION

For the Defendant:

Date: 9/3/21

By: _____
MICHAEL MIRER, ESQ.
ATTORNEY FOR DEFENDANT

Date: 9/3/21

By: _____
LEONEL RIVERO
DEFENDANT

12