UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-20160-CR-KMW

UNITED STATES OF AMERICA

vs.

LEONEL RIVERO,

    Defendant.
_____/

## GOVERNMENT'S SENTENCING MEMORANDUM

    The United States of America, by and through its undersigned counsel, hereby submits this Sentencing Memorandum as to Defendant Leonel Rivero (the "Defendant"). The Defendant is a corrupt tax preparer who admitted to submitting 118 fraudulent Paycheck Protection Program ("PPP") loan applications seeking more than $2,334,064.00 in funds intended for struggling businesses suffering the impacts of the COVID-19 pandemic.

    For the reasons set forth herein, the United States respectfully recommends that the Court sentence the Defendant to a term of imprisonment of 38 months. A sentence of 38 months' imprisonment represents just above the middle of the applicable range of the Sentencing Guidelines (the "Guidelines") as calculated by the United States Probation Office ("Probation") in the final draft of the Presentence Investigation Report ([ECF No. 33] (the "PSR")). Furthermore, the recommended sentence will provide punishment for the offense of conviction that is sufficient, but not greater than necessary, to accomplish the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

## I.    FACTUAL BACKGROUND

In early 2020, as the COVID-19 pandemic spread across the country and disrupted everyday life, causing illness, death and economic distress, the U.S. government assembled relief programs to help those whose livelihoods were jeopardized. One of those programs was the PPP. Against this backdrop, the Defendant, a tax professional, saw an opportunity to enrich himself by using his tax business clients and his knowledge about Internal Revenue Service ("IRS") forms to submit 118 false and fraudulent PPP loans applications to an SBA-approved loan processor, Square Capital. In exchange for submitting the fraudulent PPP loan applications on behalf of others, the Defendant received kickbacks—a percentage of the loans generated by the fraudulent applications. As part of the scheme, the Defendant also fraudulently obtained two PPP loans for his own company, Rivero Tax Group, Inc. ("RTG"). But the Defendant did not stop there. Even after being confronted by law enforcement about the fraudulent loan scheme, the Defendant continued to defraud the U.S. government by submitting applications seeking loan forgiveness for PPP loans that he knew were false and fraudulent.

### A.    The CARES Act

In March 2020, in response to the many challenges presented by the pandemic, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the CARES Act). Pub. L. No. 116-136, 134 Stat. 281 (2020). One of the goals of the CARES Act was to help businesses make payroll and pay operating expenses (and thereby avoid failure). To that end, the CARES Act created a new government program, the PPP, to enable the issuance of loans, that ultimately could be forgivable, to small businesses in operation as of February 2020.

Under the PPP, loans were processed and funded by participating lenders. The loans were guaranteed by the Small Business Administration (the "SBA"), and ultimately would be forgiven

if borrowers spent the loan proceeds on permissible expenses, including spending a substantial percentage on payroll. To qualify for a PPP loan, a business was required to submit an application, and supporting documentation, that established, among other things, the number of persons employed by the business, and the amount of the business' payroll expenses.

The Economic Injury Disaster Loan (EIDL) program was an SBA program that provided low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters. In addition to the PPP, the CARES Act also authorized the SBA to provide EIDLs to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic.

EIDL applications were submitted directly to the SBA. The amount of the loan, if the application was approved, was determined based, in part, on the information provided by the applicant about employment, revenue, and cost of goods.

**B.** **Overview of Defendant's Conduct**

A more detailed recitation of the facts relating to the scheme are detailed in the Information ([ECF No. 1]), Defendant's factual proffer statement ([ECF No. 21]), and the PSR ([ECF No. 33]).

As noted, between May 2020 and June 2020, the Defendant submitted approximately 118 fraudulent PPP loan applications to Square Capital on behalf of himself and others. On each PPP loan application, the defendant falsely stated the named applicant's prior-year income and expenses and submitted false and fraudulent IRS forms, which purported to document the named applicant's income and expenses. In fact, the prior-year tax information was completely fictional; all but four of the 118 loan applications contained **<u>identical</u>** 2019 IRS Form 1040, Schedule C information. Combined, the 118 PPP loan applications sought approximately $2,334,064.00 in

PPP loan funds. Approximately 47 of the 118 fraudulent PPP loan applications were funded, resulting in the disbursement of approximately $903,665.56 to the named applicants' accounts.

One of the 118 fraudulent PPP loan applications was submitted on behalf of the Defendant's business, RTG. On this application, the Defendant claimed the same gross receipts or sales, net profits, and expenses as almost all of the other 118 loan applications submitted. As a result of this fraudulent PPP loan application, the Defendant received approximately $15,375.01 in PPP loan funds from Square Capital.

Prior to fraudulently obtaining the PPP loan from Square Capital, the Defendant had fraudulently obtained approximately $32,323 in PPP loan funds from another PPP loan application that he submitted on behalf of RTG to Wells Fargo Bank. Under the PPP, businesses were not permitted to obtain more than one PPP loan and the SBA prevented double dipping by only authorizing one loan per employer identification number. To circumvent this, the Defendant used his social security number on the loan application submitted to Square Capital and used RTG's employer identification number on the application submitted to Wells Fargo Bank.[1]

In September 2021, agents executed a search warrant at the Defendant's house. There, they conducted a voluntary interview of the Defendant, in which the Defendant admitted to submitting the 118 PPP loan applications. He also acknowledged being **previously** sanctioned by the IRS for submitting false tax information. Yet even after being confronted by law enforcement, the Defendant continued to commit fraud—by filing applications seeking loan forgiveness for loans that he knew (and which law enforcement explained to him) were fraudulent. Specifically,

---

[1] In addition to the two PPP loans, the Defendant also applied for and received an EIDL on behalf of RTG in the amount of $149,900. This application also contained a series of fraudulent representations.

Square Capital received applications seeking loan forgiveness for 46 of the 47 funded PPP loans. This included an application for loan forgiveness submitted by the Defendant on his own behalf, which was sent to Square Capital on or about November 16, 2020—just a few weeks after law enforcement contacted him. As a result of his application for loan forgiveness, the Defendant's own fraudulently obtained loan from Square Capital in the amount of $15,371.01 was forgiven. In addition, according to Internet Protocol ("IP") information provided by Square Capital, three other applications seeking loan forgiveness were submitted using the same IP address that Defendant used to submit the 118 PPP fraudulent loan applications. All three of these loans were forgiven at least in part. The Defendant also submitted an application seeking loan forgiveness for the PPP loan he received from Wells Fargo Bank. This loan forgiveness application was denied. Again, the application appears to have been submitted after the search warrant of Defendant's residence.

## II.    PROCEDURAL HISTORY

On March 16, 2021, the Defendant was charged by criminal information with one count of wire fraud, in violation of Title 18, United States Code, Section 1343 ([ECF No. 1]). The Defendant pleaded guilty before this Court to the Information pursuant to a written plea agreement on September 3, 2021 ([ECF No. 21]). Sentencing is presently scheduled for November 17, 2021.

## III.   SENTENCING GUIDELINES CALCULATIONS

As explained below, the United States submits that the Defendant's Total Offense Level is 20. At Criminal History Category I, this produces an advisory Guidelines range of 33-41 months of imprisonment pursuant to the Sentencing Table in Chapter 5, Part A of the Guidelines.

### A.    **The PSR Correctly Computes the Offense Level**

As set forth in the PSR, Probation computes the Total Offense Level at 20 (PSR ¶¶ 43-52).

The United States concurs with the Offense Level computation in the PSR, which is as follows:

| | |
|---|---|
| Base Offense Level, § 2B1.1(a)(1) | 7 |
| Loss greater than $1,500,000 but less than $3,500,000, § 2B1.1(b)(1)(I) | 16 |
| Acceptance of Responsibility and Timely Notification § 3E1.1(a) and (b) | (3) |
| **Total Offense Level** | **20** |

The Defendant does not dispute that these Guidelines provisions are applicable to him. The only component of the Guidelines computation in the PSR to which the Defendant objects is that Probation does not recommend a mitigating role adjustment under Section 3B1.2. In his written objections to the PSR, filed October 28, 2021 ([ECF No. 32]), the Defendant argues that he is entitled to 3-level reduction pursuant to Section 3B1.2. As explained below, the Defendant is not entitled to any mitigating role adjustment.

      B.      **Defendant is Not Entitled to a Mitigating Role Adjustment.**

The Defendant's role in the offense to which he has pleaded guilty does not warrant any mitigating role adjustment. The Defendant is being sentenced for submitting *118* fraudulent PPP loan applications. He is the architect of this scheme. The Defendant is the one who prepared the bogus documents, including the false IRS forms with which he was uniquely familiar. The Defendant is the one who submitted the false loan applications. And the Defendant is the one who received kickbacks for loans he submitted on behalf of others. While the other loan recipients may have benefited financially, they are not the ones who prepared or submitted these fraudulent applications. Indeed, it appears that at least some of the loan recipients did not know that the Defendant had included false and fraudulent information and documents with their loan applications. As explained in the PSR, in December 2020 and February 2021, law enforcement

interviewed a number of individuals for whom the Defendant submitted PPP loan applications to Square Capital. They stated that the Defendant prepared their taxes and that the Defendant had submitted the PPP loan applications on their behalf. All stated that they never provided any documents to the Defendant in order to apply for the loans and when they were shown the Schedule C that was included in their respective PPP loan applications, they said they did not know what the expenses reported on the Schedule C, which was submitted with their respective PPP loan applications, represented. Each admitted to paying the Defendant compensation in exchange for submitting the loan applications. In short, this was the Defendant's idea. Furthermore, the Defendant is a professional tax preparer. The applicants did not know how to commit this fraud; he did. *See* United States v. Maurival, 848 F. App'x 397, 400 (11th Cir. March 22, 2021) (enhancing tax preparer as leader/organizer where he provided guidance on how to claim false deductions and credits and the means to file their false tax returns). The Defendant was central to the relevant conduct for which he is being held accountable. His role is not minor.

Finally, as the Guidelines note, determining whether to apply a mitigating role is heavily dependent upon the facts of the particular case, and the Court should consider a list of non-exhaustive factors set forth in Application Note 3(C) to § 3B1.2. Several of those factors weigh *against* a reduction for a mitigating role, most notably that (1) the Defendant directly performed nearly all of the acts in the criminal activity, including the forging of IRS documents and the submission of the false and fraudulent loan applications; and (2) the Defendant stood to benefit from the criminal activity, and did benefit, having received fraudulent loan proceeds as well as payment from the other applicants. That the Defendant did not keep all of the loan proceeds does not diminish his role in the offense, as he claims [ECF No. 32 at 2-3]. This is not a case where the Defendant performed certain tasks for others for which he did not benefit.

In sum, there is no legal or factual basis to apply a mitigating role adjustment under § 3B1.3. Accordingly, the Court should adopt the Guidelines computation recommended by the United States and Probation as set forth in the PSR.

## IV. CONSIDERATION OF SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

Title 18, United States Code, Section 3553(a), enumerates several factors that the Court shall consider in sentencing a defendant. As addressed in turn below, the 3553(a) factors relevant to the Defendant support the sentence recommended by the United States.

### A. Nature and Circumstances of the Offense

The Defendant has committed a galling offense. During a national catastrophe when the federal government and lenders were racing to get disaster relief loans out to small businesses and in turn, wages to employees who needed the money to survive, the Defendant took advantage of the program by stealing. The Defendant's offense is aggravated by a number of factors: First, the Defendant did not merely steal from the government. Rather, he stole from a program designed to try to provide a lifeline to small businesses and their employees. This was a limited pool of money, which ultimately was exhausted. The Defendant's crime—which includes obtaining not one but two PPP loans for his own company— deprived people who actually and urgently needed PPP loans of the ability to get them. Second, the Defendant's crime was not a momentary lapse, but a determined and ongoing effort. He filed *118* separate fraudulent loan applications over a two month period. He systematically used the same false Schedule C for nearly all of the applications. Finally, he continued to engage in the fraud even after he was confronted by law enforcement. Not only did the Defendant submit two loan forgiveness applications for his company, one of which he submitted within weeks of being interviewed by law enforcement, but he also used the same IP address that he used to submit the 118 false loan applications to submit loan forgiveness

applications for three other fraudulent loans. The Defendant's continued criminal conduct warrants a sentence of imprisonment that is above the middle of the Guidelines range. The United States' recommended sentence of 38 months' imprisonment is sufficient but not greater than necessary to accomplish this goal.

  **B.**  **History and Characteristics of the Defendant**

The Defendant is a 36-year-old tax preparer in South Florida who is the registered agent and principal of RTG. The Defendant has previously been penalized by the IRS for failing to verify tax return information he submitted on behalf of clients. (PSR ¶ 36.) Yet the Defendant has no criminal history points. (*Id.* ¶ 55.)

The Defendant did continue to engage in the misconduct even after he was confronted by law enforcement when he submitted loan forgiveness applications for loans that he knew were fraudulent.

The Defendant agreed to plead guilty before being indicted, and thus deserves credit for accepting responsibility early and saving the government resources in preparing for trial. But the sentence recommended by the United States reflects such acceptance because it is within the Guidelines produced by the Offense Level that has been adjusted downward by three levels for acceptance of responsibility pursuant to Section 3E1.1(a) and (b).

  **C.**  **Need for the Sentence to Afford Adequate Deterrence to Criminal Conduct and Protect the Public from Further Crimes of the Defendant**

The sentence in this case should address a need for both general and specific deterrence. As to general deterrence, the Eleventh Circuit has explicitly stated that "general deterrence is an important factor in white-collar cases, where the motivation is greed." *United States v. Hayes*, 762 F.3d 1300, 1308 (11th Cir. 2014). As explained above, this case was motivated by greed at time

9

when millions of Americans were suffering from the economic impact of a global pandemic. As the pandemic spread, so too did fraud related to the PPP program and other programs designed to provide critical economic assistance—especially in the Southern District of Florida. The government's recommended sentence of imprisonment in this case is thus appropriate to provide both specific and general deterrence. Such a sentence will send a clear message to the Defendant and other offenders that there are serious consequences for defrauding government pandemic relief programs. Actors like the Defendant who seek to defraud these programs not only drain the program of limited funding, they also make it more difficult for administrators of government and other relief programs to get aid to individuals that qualify for and need it. The Defendant's sentence will serve as a warning and deterrent to others inclined to exploit pandemic relief programs.

Furthermore, a sentence just above the middle of the Guidelines range is sufficient to protect the public from future crimes of this Defendant who has no prior convictions.

    **D.**    **Need for the Sentence to Avoid Unwarranted Sentencing Disparities**

The 38-month sentence that the Government is proposing is consistent with sentences in other PPP cases. A review of PPP cases suggests that defendants who have committed substantial PPP frauds (that is, those measured in the hundreds of thousands to millions of dollars), generally have received sentences that are measured in years, and often have received sentences that approach or fall within the applicable sentencing Guidelines.

For example, in *United States v. Philus, et al.*, Case No. 21-CR-20067-Cooke (S.D. Fla.), the defendant conspired to submit two fraudulent loan applications seeking a total of $688,325. Nearly all of the money was apparently returned, and the defendant only received around $2,500

in personal benefit. He was sentenced to 30 months' imprisonment despite pleading to a less serious offense (18 U.S.C. § 371) than the offense of conviction in this case.

In *United States v. Smith, et al.*, Case No. 20-CR-196 (E.D. Wis.), the defendant, who was a special education teacher with no prior criminal history, conspired with his brother to submit five fraudulent loan applications seeking $960,000. He pled guilty to one count of bank fraud and was sentenced to 36 months' imprisonment.

In *United States v. Tubbs,* No. 4:20-cr-00193-BSM (E.D. Ark.), the defendant obtained two PPP loans totaling $1,933,262, but only spent $14,000. She was sentenced to 41 months' imprisonment.

Here, the Defendant submitted substantially more fraudulent loan applications than the defendants in *Philus*, *Smith*, or *Tub*. Moreover, the Defendant managed to obtain two PPP loans for himself and sought to have those loans forgiven even after he knew that law enforcement was investigating the Defendant and his company. The 38-month sentence that the Government is proposing is therefore consistent with sentences in other PPP loan fraud cases with similar facts.

IV.   **RESTITUTION & FORFEITURE**

Restitution is mandatory in this case pursuant to 18 U.S.C. § 3663A(a)(1). The United States submits that the total amount of restitution owed is $1,085,901.56. This amount includes $903,665.56 for the 47 PPP loans obtained from Square Capital; $32,336 for the one PPP loan obtained from Wells Fargo Bank; and $149,900 for the EIDL obtained from the SBA. (PSR ¶ 36).

Furthermore, pursuant to the Plea Agreement, the Defendant agreed to the forfeiture of the approximately $975,528 ([ECF No. 21] ¶¶ 10-11]). On October 18, 2021, the Court entered an amended preliminary order of forfeiture in which the Court entered a forfeiture money judgment of $903,665.56 and found, pursuant to 21 U.S.C. § 853(p), that the following property should be

forfeited to satisfy the forfeiture money judgment: (a) $197,611.01 formerly on deposit at 6079719002 at Wells Fargo Bank, held in the name of Rivero Tax Group, Inc. and (b) approximately $773,600 in U.S. currency seized from the Defendant's residence on or about September 28, 2020 ([ECF No. 28 at 4]).

## CONCLUSION

For the forgoing reasons, the United States respectfully recommends that the Court sentence the Defendant to a term of imprisonment of 38 months, to be followed by a term of supervised release of three (3) years. The United States also requests that the Court order the Defendant to pay $1,085,901.56 in restitution, $903,665.56 in forfeiture, and a $100 special assessment.

Respectfully submitted,

| | |
|---|---|
| JUAN ANTONIO GONZALEZ<br>U.S. Attorney<br>Southern District of Florida | JOSEPH S. BEEMSTERBOER<br>Acting Chief<br>U.S. Department of Justice<br>Criminal Division, Fraud Section |
| By:  /s/ Christopher B. Browne<br>CHRISTOPHER B. BROWNE<br>Assistant United States Attorney<br>Southern District of Florida<br>99 Northeast 4th Street, 6th Floor<br>Miami, Florida 33132-2111<br>Phone: (305) 961-9419<br>E-mail: christopher.browne@usdoj.gov | /s/ Della Sentilles<br>DELLA SENTILLES<br>Trial Attorney<br>U.S. Department of Justice<br>Criminal Division, Fraud Section<br>1400 New York Avenue, NW<br>Washington, D.C. 20005<br>Phone: (202) 445-8793<br>Email: della.sentilles@usdoj.gov |

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that I electronically filed the foregoing document with the Clerk of the Court using CM/ECF on November 15, 2021.

/s/ Della Sentilles
Trial Attorney
